[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff wife, 58, and the defendant husband, 60, married each other on August 3, 1956, at Carmel, New York. Both parties have been residents of this state for many years, thereby satisfying the residency jurisdictional requirement for this action of dissolution brought by summons and complaint dated January 25, 1991. All four children of the marriage have attained majority. The State of Connecticut has no financial interest in this judgment. The court, having found all of the allegations of the amended complaint dated August 17, 1993 proven, and therefore, true, hereby enters a judgment dissolving the marriage of the parties and they are each declared to be single and unmarried. The court notes that the parties entered into a religious ceremony reaffirming their marriage on September 29, 1956, at Waterbury, Connecticut, as alleged in the complaint, but that is not presently before the court, since the court is entering judgment dissolving the civil marriage.
At the time of their marriage, the plaintiff had just recently graduated from high school, and the defendant was completing his courses at UCONN for a degree in pharmacy. Their oldest child, Patty, was born fourteen (14) months after the marriage. The second child, Jay, was born on November 10, 1959. Their third child, Tara, was born on February 5, 1962, and their youngest child, Lisa, was born on June 25, 1963. Both Jay and Lisa had substantial hearing loss and needed special training. The oldest child, Patty, was described by her mother as hyperactive. The plaintiff was engaged in raising the parties' children, partially with the aid of a housekeeper. She never worked during the marriage, and began working, as an L.P.N. in July, 1990. Prior to that, she worked in the family business as CT Page 9536 a part time clerk and payroll clerk for approximately eleven (11) years. Neither party brought any assets to the marriage.
After a short stint in the military, immediately after their marriage, the defendant returned to work as a pharmacist at a Naugatuck drug store. He then acquired an interest in a Wolcott pharmacy, which he then sold in 1960 at a profit, and which the defendant testified was the original seed money for the Tucker Anthony brokerage account. He then worked for the Whelan Drug chain for fourteen (14) or fifteen (15) years until 1971, when he was employed as general manager by the owner of Arthur Drug Stores, a chin of four (4) Connecticut drug stores, located in the general Hartford area. In 1979, the owner of the chain died, and the defendant purchased the business. With a display of business acumen, the defendant was able to buy the minority interest held by the seller's children and was also able to negotiate a new lease for the flagship store, which then enabled the seller's family to sell the real estate to an insurance company. The defendant obtained a twenty (20) year buyout, and the total value of the buyout was over one million dollars. Three more drug stores, located in East Hartford, Putnam and Clinton, were acquired, and a refinance of the entire operation was done in 1986 or 1987, allowing the defendant to payoff the former owner's family. Two more new store locations were opened and two of the existing stores were disposed of in the operation of the business. The defendant was the chief executive officer and president of Arthur Drug Stores, which, until 1991, consisted of several separate corporations. At that time, all of the various corporations were folded into the flagship store corporation. The present division of stock among the family members is 30% held by the defendant; 40% held by the son, Jay; 10% held by the daughter, Tara; 10% held by the daughter, Patty; and the remaining 10% held by the plaintiff. There was in existence a voting agreement for 90% of the stock entered into among all the family members except the plaintiff (Plaintiff's Exhibit F), which the defendant terminated during trial.
The court has determined that the defendant's 30% and the plaintiff's 10% shall be treated as the parties' 40% interest in the corporation. The court will compensate the plaintiff for her 50% interest therein, or 20% of the total shares outstanding. There is no question in the court's mind that the plaintiff's interest should be transferred to the defendant. CT Page 9537
The defendant had entered into an agreement to dispose of three (3) stores, located in Rockville, Manchester and Rocky Hill, to another drug store chain, and that transaction was completed and closed during trial. Simply put, the seller retained the cash and accounts receivable of the selling corporation, along with its liabilities. All other assets were transferred to the buyer for a consideration of $345,000.00, plus dollar for dollar in inventory. The contract included a non-competition provision as part of the assets. From the purchase price, $90,000.00 was dedicated to pay the landlord of the Rocky Hill store in exchange for a lease termination. For ninety (90) days, $100,000.00 of the purchase money was to be held in escrow to determine if any other claims would surface, and after the expiration of the time with no pending claims, the money could then be released. All of the closing documents were submitted as an exhibit, Plaintiff's Exhibit AA.
The parties have not agreed on the fair market value of the corporation and their respective interests therein. Each party presented an expert witness which, upon making certain assumptions, arrived at disparate valuations. The plaintiff's expert, Joel Rackour, of New York, arrived at a value for all seven (7) locations of $2,680,000.00. After considering the pending sale of the three stores, since sold, he testified that the fair market value of the remaining business was $2,600,000.00. He did not discount the value for minority interests. The defendant's expert, Peter Budwitz, C.P.A., a local accountant with thirty (30) years experience and having testified several times previously in Connecticut courts, reached a valuation of $1,367,000.00, including the three stores about to be sold. Mr. Budwitz analyzed these three (3) stores' cash flow as indicating no profit after their share of all the company's expenses had been deducted. The court has reviewed all of the expert evidence, and has adopted the valuation testified to by the defendant's expert as being more accurately reflective of the fair market value of Arthur Drug Stores.
The court also notes that one of the benefits of being able to complete the sale of the three stores is the return to the defendant of $130,000.00, which is in repayment of a loan made by the defendant from the Tucker Anthony account in order for the corporation to show a clean loan sheet for thirty days.
The court indicated above that a Tucker Anthony brokerage account was started shortly after the parties' marriage, and, CT Page 9538 again giving credit to the defendant's business acumen, the brokerage account has grown to a gross value of $932,888.00 against which there is a margin account charge of $446,791.47, as of June 30, 1993 (Plaintiff's Exhibit Y). The account equity is $486,096.00 with an estimated annual income based on what is presently held of $35,897.00, offset by margin interest. However, when the $130,000.00 that was removed to lend to the corporation (Plaintiff's Exhibit W) is returned to the Tucker Anthony account, the margin will be reduced by that amount and the equity in the account increased by a like amount.
The brokerage account contains both conventional interest bearing bonds and zero coupon bonds. The latter group bear a face value of $855,000 with maturities ranging from April 1, 1999 to July 1, 2008, and having a present market value of $457,037.00, (Defendant's Exhibit #10). The defendant designed the portfolio's holdings to allow the conventional bonds to be sold to cover the margin thereby permitting the zero coupon bonds to be redeemed at face value as they mature.
Although the parties stipulated that the brokerage account would not be invaded while this case was pending, the defendant drew over $50,000.00 for payment of debts and for his living expenses. These withdrawals were in addition to the $130,000.00 lent to Arthur Drug Store discussed above. The defendant attempted to justify his breach of the parties' agreement by claiming the plaintiff delayed a settlement offer. The court infers that it is one more example of the defendant's efforts to control the parties' finances. The court considers $150,000.00 of the withdrawals as a preference obtained by the defendant. The equity in the account as of June 30, 1993 was $486,096.00 (Plaintiff's Exhibit Y) to which is added the $150,000 charged to the defendant, totaling $636,096.00. The plaintiff is found to be entitled to 50% or $318,048.00 as her share.
The marital home is not sought by the plaintiff. It was purchased almost 30 years ago for under $20,000.00. It now has a fair market value of $160,000.00, bears two mortgages totaling about $110,000.00 and has always been in the defendant's name. The defendant has purchased a home on Glenview Avenue for about $100,000.00 and that parcel is encumbered by a $96,000.00 mortgage.
The plaintiff has a Tucker Anthony account valued at $19,000.00, a Lutheran Brotherhood account valued at $6,000.00, CT Page 9539 life insurance on the defendant's life for $240,000.00 with a cash value of $60,000.00.
Both parties have I.R.A. accounts worth about $50,000.00.
Finally, there is a three week time share in Hawaii and tangible personal property consisting of furniture, furnishings and miscellaneous.
The court will conduct a further hearing by way of articulation to divide any disputed items, if necessary.
The defendant has reduced his salary while this action has been pending. The court views this an analogous to Marcus v. Marcus, 175 Conn. 138 in managing the finances for a party's benefit and the court's alimony order infra takes this into consideration.
In reviewing the statutory criteria, the court notes neither party is in the best of health. The court finds that the marriage breakdown became irretrievable in 1990 when the defendant told the plaintiff he no longer loved her. His protestation that the marriage broke down many years earlier is not borne out by the evidence. The plaintiff was a homemaker and mother, totally dependent upon the defendant for financial support. For his part he was able to provide it to the plaintiff and to his children. The distribution of the stock ownership amply demonstrates this. The plaintiff is entitled to periodic alimony until her remarriage or death.[1]
As part of the judgment the court enters the following orders.
1. Alimony shall be paid by the defendant to the plaintiff in periodic weekly installments of $800.00 until her remarriage or the death of either party.
2. The plaintiff's stock in Arthur Drug Stores is assigned to the defendant. To compensate the plaintiff for her interest, which the court finds to be 20% of the corporation's stock, the defendant is ordered to pay to the plaintiff lump sum alimony of $273,400.00 in ten (20) semi-annual installments of $13,670.00 each, together with 2% annual simple interest payable annually on the unpaid balance, first such installment due July 1, 1994 and annually on July 1st of the next nine (9) years. CT Page 9540
3. The plaintiff is awarded bonds totaling $318,048 as her share of the defendant's Tucker Anthony account, free and clear of margin loan. It shall be the defendant's responsibility to carry the margin loan and he may select the specific bonds to be transferred to the plaintiff.
4. The defendant is awarded sole ownership of the real estate known as Connistan Avenue, Waterbury, Connecticut. He shall assume the encumbrances and shall hold the plaintiff harmless and indemnified.
5. The contents of the Connistan Avenue home shall be divided by the parties. If they are unable to agree, either party may move the court for an articulation.
6. The defendant shall retain the Glenview Avenue real property as his sole property.
7. The defendant shall retain the Hawaii time share units as his sole property.
8. The plaintiff shall retain her Tucker Anthony account, her Lutheran Brotherhood stock and her I.R.A.
9. The defendant shall retain his I.R.A. account.
10. The plaintiff shall retain ownership of the life insurance policy insuring the defendant's life in the principal sum of $150,000.00.
11. The defendant shall retain ownership of the $244,748.00 face value life insurance policy.
12. The defendant shall cooperate with the plaintiff in the event she elects to continue her medical insurance coverage COBRA.
13. The defendant shall be solely responsible for paying the $5,000.00 charge account.
14. To compensate the plaintiff for her interest in the marital home, the time share, the auto use and for her legal expenses, the court orders the defendant to pay to the plaintiff the sum of $50,000 which may be paid from his share of his CT Page 9541 Tucker Anthony account or from other sources, 50% due in 30 days and 50% due in 60 days.
HARRIGAN, J.